1  Geoff D. Biegler (Bar No. 290040)
   biegler@fr.com
2  FISH & RICHARDSON P.C.
   555 West Fifth Street, 31st Floor
3  Los Angeles, CA 90013
   Telephone: (858) 678-5070
4  Facsimile: (877) 417-2378
5
6  Attorneys for Defendant
   MYRIAD GENETICS, INC.
7
8  [additional counsel listed on signature page]
9
10              UNITED STATES DISTRICT COURT
11             CENTRAL DISTRICT OF CALIFORNIA
12                  SOUTHERN DIVISION
13  QUEST DIAGNOSTICS                Case No. SACV13-01587 AG (DFMx)
    INCORPORATED and QUEST
14  DIAGNOSTICS NICHOLS             MYRIAD GENETICS, INC.'S
    INSTITUTE,                      MEMORANDUM IN OPPOSITION TO
15                                  QUEST'S MOTION FOR LEAVE TO
                    Plaintiffs,     FILE FIRST AMENDED COMPLAINT
16
    v.                             **[REDACTED]**
17
    MYRIAD GENETICS, INC.,          Date:    February 3, 2014
18                                  Time:    10:00 am
                    Defendant.      Ctrm:    10D
19                                  Judge:   Hon. Andrew J. Guilford
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**PAGE**

I.  INTRODUCTION ...................................................................................... 1

II. FACTUAL BACKGROUND ..................................................................... 3

    A. Myriad—the Discoverer of the BRCA1 and BRCA2 Genes and Innovator of Breast and Ovarian Cancer Tests ................................. 3

    B. Litigation Involving Myriad's BRCA Patents, and Quest's Race to the Courthouse to Obtain Venue in California ....................... 4

    C. Myriad's Attempts to Move This Case to the District of Utah, the Proper Forum for the Parties' Dispute ...................................... 6

    D. Quest Concocts New Causes of Action Based on a Single Email in an Attempt to Salvage Venue in this Forum .................................. 7

    E. Quest's Proposed Amended Complaint ......................................... 11

III. ARGUMENT ......................................................................................... 12

    A. Quest's Motion for Leave to Amend Should Be Denied Because Its New Causes of Action Are Futile. ................................................. 13

        1. Quest's Amendments Are Futile Because This Court Lacks Subject Matter Jurisdiction Over Quest's New State Law Claims. ..................................................................................... 14

        2. Quest's Proposed  Section 17200 Claim Is Also Futile Because It Fails to State a Claim Upon Which Relief Can Be Granted. ................................................................................... 16

            i. Quest Cannot Assert a Claim under Section 17200 Because It Has Suffered No Economic Injury. .............. 17

            ii. Quest Cannot State a Claim Under Section 17200 Because Quest's Claim Has No Ties to California. ....... 18

        3. Quest's Proposed Defamation Claim is Futile Because It Fails to State a Claim Upon Which Relief Can Be Granted. 19

            i. Quest Cannot State a Claim for Defamation Because the Morrissey E-mail Did Not Concern Quest's Reputation. ............................................................. 19

            ii. Quest Cannot State a Claim for Defamation Because the Statements in the Morrissey Email Are True. ......... 21

    B. Quest's Proposed Amended Complaint Is a Litigation Tactic, Brought In Bad Faith. .................................................................. 23

pipeline

C.    Judicial Economy Would Not Be Served by Quest's Proposed Amendments..........................................................................25

IV.    CONCLUSION ............................................................25

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*Aetna Cas. & Sur. Co., Inc. v. Centennial Ins. Co.*,
   838 F.2d 346 (9th Cir. 1988) ...................................................................... 19

*Allen v. Ghoulish Gallery*,
   Civil No. 06cv371 NLS, 2007 WL 4207923 (S.D. Cal. Nov. 20, 2007) .......... 20

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
   133 S. Ct. 2107, 186 L. Ed. 2d 124 (2013).................................................4, 5, 6

*Barnes-Hind, Inc. v. Superior Court*,
   181 Cal. App. 3d 377, 226 Cal. Rptr. 354 (Cal. Ct. App. 1986).......................20

*Bonin v. Calderon*,
   59 F.3d 815 (9th Cir. 1995) ............................................................................ 13

*Coelho v. MRC II Distrib. Co., L.P.*,
   No. CV 11-8913-ODW, 2012 WL 424387 (C.D. Cal. Feb. 8, 2012) ..........15, 16

*Edco Plastics v. Allynce, Inc.*,
   No. SACV 12-01168 JVS, 2013 WL 1655916 (C.D. Cal. Mar. 18, 2013)........15

*Glatt v. Chicago Park Dist.*,
   87 F.3d 190 (7th Cir. 1996) ............................................................................ 13

*In re Volkswagen of Amer., Inc.*,
   296 Fed. Appx. 11 (Fed. Cir. 2008)................................................................ 14

*Kwikset Corp. v. Sup. Ct.*,
   51 Cal. 4th 310, 246 P.3d 877, 120 Cal. Rptr. 3d 741 (Cal. 2011) ................... 17

*Leadsinger, Inc. v. BMG Music Pub.*,
   512 F.3d 522 (9th Cir. 2008) ....................................................................12, 13

*Miller v. Rykoff-Sexton, Inc.*,
   845 F.2d 209 (9th Cir. 1988) .......................................................................... 13

*New.Net, Inc. v. Lavasoft*,
   356 F. Supp. 2d 1090 (C.D. Cal. 2004)............................................................21

*Norwest Mortgage, Inc. v. Superior Court*,
   72 Cal. App. 4th 214, 85 Cal. Rptr. 18 (Cal. Ct. App. 1999)................18, 19, 21

*Oliver & Tate Enters. v. Founds. Worldwide, Inc.*,
   No. 13-cg-1683, 2013 U.S. Dist. LEXIS 114527
   (C.D. Cal. Jun. 18, 2013) ........................................................................22, 23

*Polygram Records, Inc. v. Superior Court*,
   170 Cal. App. 3d 543, 216 Cal. Rptr. 252 (Cal. Ct. App. 1985)................19, 20

*Sullivan v Oracle Corp.*,
   51 Cal. 4th 1191, 254 P.3d 237, 127 Cal. Rptr. 3d 185 (Cal. 2011) ................18

*The Regents of the Univ. of Cal. v. Micro Therapeutics Inc.*,
   No. C 03-05669 JW, 2006 WL 449134 (N.D. Cal. Feb. 22, 2006) ............13, 15

*Towns v. Kernan*,
   No. CV 06/928 AG (FFM), 2010 WL 582056 (C.D. Cal. Feb. 11, 2010)........13

*Trilithic, Inc. v. Wavetek U.S. Inc.*,
   6 F. Supp. 2d 803 (S.D. Ind. 1998)................................................................15, 16

*United Mine Workers of Amer. v. Gibbs*,
   383 U.S. 715, 86 S. Ct. 1130 (1966) ................................................................14

## STATUTES

28 U.S.C. § 1367................................................................11, 12, 14, 16

California Business & Professions Code, Section 17200........................11, 17, 18

California Business & Professions Code, Section 17204......................................17

## OTHER AUTHORITIES

Fed. R. Civ. Pro. 15(a) ........................................................................12, 13

Fed. R. Civ. Pro. 15(d) ........................................................................13, 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    INTRODUCTION

Quest's proposed "defamation" and "unfair competition" claims give new meaning to the old saw of "making a mountain out of a molehill."  Based entirely on a single email (from a Myriad sales representative, Sean Morrissey, to a Quest customer located in ▉▉▉), which was clarified the very next day, Quest's claims have nothing to do with California or this patent infringement case.  Rather, they are a misguided attempt by Quest to deflect attention from its ongoing infringement of Myriad's patents and to secure venue in this Court, instead of the District of Utah.  And while amendments to pleadings should typically be liberally granted, in this instance, the Court should decline Quest's invitation to turn one e-mail into multiple torts worthy of this—or any other—Court's time.

Quest's proposed claims fail to even get over the initial hurdle in any case, subject matter jurisdiction.  Because the claims do not arise from the same operative facts as its declaratory judgment patent claims, supplemental jurisdiction under 28 U.S.C. § 1367(a) does not exist here.  Quest's declaratory judgment claims raise factual questions related to the function and development of Quest's products; the sale and use of those products; the conception, reduction to practice, and content of Myriad's patents; and the scope and content of the prior art.  Quest's proposed state law claims do not raise any of these issues but, instead, center on the content of the single identified email, which has nothing to do with Myriad's BRCA patents.

Even if the Court finds jurisdiction, however, Quest cannot state a claim under the California unfair competition statute both because Quest has failed to

allege any economic injury and because none of the acts relevant to the claim occurred in California.  On the former, Quest does not allege that it lost business or suffered any other pecuniary injury.  On the latter, all of the individuals who sent or received the relevant email were located outside of the state, and Quest has not alleged that the only California company in this case, Quest Nichols, a laboratory that developed the tests in question, suffered any damage as a result of the email.

Quest's "common law" defamation claim is also futile.  Quest's claims relate to statements concerning (in Quest's incorrect view) the quality of Quest's products, not Quest's reputation, as is required for a defamation claim.  Although Quest's claim sounds more of trade libel, Quest did not specifically plead that theory.  But, even so, any claim on that basis would fail because Quest did not plead any loss of business or pecuniary damage.  Moreover, the simple fact is that the statements in the Morrissey email are true, and Mr. Morrissey corrected any possible misunderstanding in his follow-up email the next day.   Incredibly, Quest asserts that "Myriad was presented with an opportunity to retract its false and defamatory statements, but it refused to do so"—even though Myriad told Quest about Mr. Morrissey's follow-up email before Quest filed its motion.

In light of all the above, Quest's true motive is apparent.  After Quest contacted Myriad about the Morrissey email, despite strongly disagreeing that the email was in any way improper, Myriad agreed to change the language it used in communications regarding inaccurate BRCA testing and confirmed that the Morrissey email was an isolated incident, thereby addressing all of Quest's professed concerns.  Quest nonetheless rushed to file its motion to amend so that it

could be heard on the same day the Court was scheduled to hear Myriad's motion to dismiss for lack of jurisdiction or, in the alternative, to transfer.  It would thus appear that Quest's motivation for this motion is less about the email and more about trying to keep this anticipatory declaratory judgment case in California and to distract from its infringement of Myriad's patents.

Accordingly, Myriad respectfully submits that the Quest's motion for leave to amend should be denied.

## II.    FACTUAL BACKGROUND

### A.    Myriad—the Discoverer of the BRCA1 and BRCA2 Genes and Innovator of Breast and Ovarian Cancer Tests

Founded in 1991 as a startup company out of the University of Utah, Myriad was one of the first companies focused on genetic research.  (Docket Nos. 20-3, 20-4.)  In the early-to-mid 1990's, Myriad scientists, collaborating with colleagues across the United States and Canada, including scientists at the University of Utah, identified two human genes, BRCA1 and BRCA2, which are linked to hereditary breast and ovarian cancer, and determined the sequence of those genes.  This discovery was hailed world-wide, even leading the NBC nightly news on the day it was announced.  (Docket No. 20-5.)

Since this discovery, Myriad has invested over $500 million to bring BRCA1- and BRCA2-related diagnostic tests for hereditary breast and ovarian cancer to market and to improve these tests to provide the best possible outcomes for patients.  (Docket No. 20-6.)  Myriad's efforts have revolutionized patient care and provided medical diagnosis and treatment options never thought possible.  As

a result of its discovery, Myriad owns or has exclusive licenses to 24 patents that cover diagnostic methods employing the BRCA1 and BRCA2 genes and tools useful for diagnosing breast and ovarian cancer based on the presence of particular nucleotide sequences within those genes, including the fourteen patents identified by Quest in this suit.

### B. Litigation Involving Myriad's BRCA Patents, and Quest's Race to the Courthouse to Obtain Venue in California

Myriad's BRCA patents have been the subject of very important recent litigation that identifies aspects of the human genome over which a discoverer may and may not obtain patent rights. In brief, on June 13, 2013, after a lengthy procedural history, the Supreme Court held that certain claims in the patents drawn to naturally occurring BRCA1 and BRCA2 genes extracted from a cell were not patent eligible. In so doing, however, the Court emphasized the limited scope of its ruling, and endorsed the validity of other claims pertaining to synthetic DNA and methods of testing and using the BRCA1 and BRCA2 genes in medical diagnosis and treatment. *See Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2120, 186 L. Ed. 2d 124 (2013) ("the *AMP* case") ("We *merely hold* that genes and the information they encode are not patent eligible under § 101 simply because they have been isolated from the surrounding genetic material.") (emphasis added).

Just hours after the *AMP* decision issued, Quest announced its intention to offer a BRCA test service, as did several other companies.[1] (Docket No. 1 at ¶ 57.)

---

[1] Ambry Genetics Corp. ("Ambry") and Gene by Gene Ltd. ("Gene by Gene") publicly announced their intention to immediately offer tests employing technology

Despite Quest's announcement, Myriad never contacted Quest about Quest's planned launch or suggested that Quest take a license for its planned products. Even so, based on lawsuits that Myriad filed against other companies that began selling BRCA tests, Quest believed that Myriad would promptly sue Quest for infringement in the District of Utah once it launched a BRCA test.  (*Id.* at ¶ 61.)

Quest did not want to give Myriad the chance to file suit against Quest in Utah. But, because Myriad had never directed any affirmative act at Quest regarding the BRCA tests, Quest could not meet the case or controversy requirement for declaratory judgment jurisdiction.[2]  In an apparent attempt to manufacture jurisdiction, Quest allegedly had its Vice President of Licensing and Alliances, Nicolas J. Conti, contact multiple Myriad employees in July 2013 to try to elicit statements regarding Myriad's patents that would provide a "specific reason" for Quest to believe that it would be "the target of a patent infringement lawsuit from Myriad."  (*Id.* at ¶¶ 61, 65; Docket No. 24-3 at ¶¶ 5-10.)  As fully described in Myriad's briefing in support of its motion to dismiss, there can be no question that Quest had no motive for these alleged communications except to try to manufacture declaratory judgment jurisdiction, beat Myriad to the courthouse, and thereby hopefully obtain venue in California.

---

claimed in Myriad's BRCA patents just hours after the *AMP* decision.  (Docket Nos. 20-8, 20-9.)  On July 9 and 10, 2013, Myriad filed complaints against Ambry and Gene by Gene, respectively, in the District of Utah, alleging infringement of ten BRCA related patents.  (Docket Nos. 20-10, 20-11.)

[2]  *See Ass'n for Molecular Pathology v. United States Patent and Trademark Office*, 689 F.3d 1303, 1318 (Fed. Cir. 2012), *overruled on other grounds by AMP*, 133 S. Ct. 2107.

MYRIAD'S MEMO IN OPPOS TO QUEST'S MOTION
FOR LEAVE TO FILE FIRST AMENDED COMPLAINT
Case No. SACV13-01587 AG (DFMx)

After July 2013, there were no further communications regarding BRCA testing between Quest and Myriad.  Nonetheless, on October 10, 2013, Quest filed the complaint in this case, seeking declaratory judgment of noninfringement and invalidity of 14 patents owned or exclusively licensed to Myriad relating to BRCA genes.  (Docket No. 1.)  At that time, Quest had not yet launched any BRCA tests, nor had Myriad contacted Quest about BRCA testing, patents, or licensing.  It was not until October 15, five days after filing its anticipatory complaint, that Quest started offering its BRCA1/2 tests and services.  (Docket No. 20-20.)

## C.   Myriad's Attempts to Move This Case to the District of Utah, the Proper Forum for the Parties' Dispute

On October 22, a week after Quest launched its BRCA tests, Myriad sued Quest for patent infringement in the District of Utah ("the Utah suit").[3]  Because of the clearly anticipatory nature of Quest's complaint in this case, Myriad also moved to dismiss Quest's complaint for lack of jurisdiction or, in the alternative, to transfer the case to Utah where six BRCA-related patent litigations are now pending.  (Docket No. 20.)  Myriad also requested that the Judicial Panel on Multidistrict Litigation ("JPML") consolidate and transfer the pending BRCA-patent related actions, including this case, to the District of Utah.  (*See* Docket Nos. 35, 35-1.)  Quest was one of only three of the seven potential BRCA infringers that opposed Myriad's motion to consolidate the BRCA cases in Utah.  Presumably, the other BRCA infringers recognized the efficiency of the Utah court handling these cases, given the

---

[3] In the Utah suit, Myriad first alleged infringement of eight of the 14 patents asserted by Quest in this action.  (Docket No. 20-17 at ¶¶ 20-75.)  On October 31, 2013, Myriad filed an amended complaint in the Utah action for the remaining six patents identified in Quest's complaint.  (*Id*., Docket No. 20-23 at ¶¶ 9-21.)

number of BRCA-related cases pending in that district and Judge Shelby's head start on learning the technology at issue and understanding the issues relevant to Myriad's infringement claims.  (Ex. 1.[4])

### D.   Quest Concocts New Causes of Action Based on a Single Email in an Attempt to Salvage Venue in this Forum

On December 4, 2013, with Myriad's motion to dismiss and motion before the JPML pending, Quest sent Myriad a letter concerning a December 3, 2013 email from a Myriad product specialist in Arizona, Sean Morrissey, to Sheri ████, a representative of one of Quest's clients in ████  ████ ("the Morrissey email").[5]  (Ex. 2.)  In the email, Mr. Morrissey explained to Ms. ████  that there were some "new labs" offering BRCA testing and that some patients had received inaccurate results from these tests:

> I am contacting you to arrange a short in-person or web meeting.   The purpose of the meeting is to share recent data that will have a material impact on your health plan specific to genetic BRCA1/2 testing for hereditary cancer.  At the moment, ***there are new labs offering this testing and unfortunately there are patients that have already received inaccurate results that have resulted in the wrong care***.  It is my understanding that ████████ is requiring all BRCA testing ordered for their members be run by the lab Quest Diagnostics, even when they specify Myriad's BRACAnalysis as the BRCA test of choice.  Considering the risks for the providers and patients in your plan, I would like to take about 30 minutes to walk you through this data and how events like these could be avoided for the providers and members of ████████

---

[4] All exhibits are attached to the Declaration of Geoffrey D. Biegler ("Decl. of Biegler"), filed herewith, unless otherwise noted.

[5] Ms. ████ then contacted Sandra B. St. Pierre, Regional Director, Health Plans at Quest Diagnostics in the Portland, Oregon area.  (Docket No. 32-2, Ex. 2 at page 70; Ex. 3.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(*Id*. (emphasis added).)   Mr. Morrissey further explained that new genetic tests (such as BRCA assays) do not have to meet any standard for equivalence, unlike pharmaceutical products:

> ***Unlike FDA approval for drugs and devices, there is no standard of equivalence that labs must meet before selling these tests***.  Physicians in your network may assume that if a test is being sold by another lab then it must be equivalent.  This is not true and as you can imagine, the patient care and cost consequences of a wrong answer for a hereditary cancer test, could be significant.

(*Id*. (emphasis added).)  Accordingly, Mr. Morrissey requested a meeting with Ms. ████  or someone else at ██████████ to explain the benefits of Myriad's BRCA tests:

> Given the clinical nature of such a discussion, would you be the appropriate person to approach about such a meeting?  If not, could you possibly help guide us to the appropriate individual(s) within your organization for such a discussion?  Are there other stakeholders who might also be interested, given the fact that we will discuss overall financial impact to your organization in addition to clinical information?  Any help you might be able to provide in connecting us with the appropriate individuals within ████ ████ is greatly appreciated!

 (Ex. 2 (emphasis added).)

Despite the fact that the Morrissey email made no statements regarding Quest's BRCA test results, Quest asserted in its December 4 letter to Myriad that the email "makes numerous misrepresentations concerning Quest's BRCA offering" and that the email was "defamatory and has resulted in damage to Quest's business relations and expectancies."  (*Id*.)   Quest's letter further demanded that Myriad (1) immediately cease and desist from making any direct or

MYRIAD'S MEMO IN OPPOS TO QUEST'S MOTION
FOR LEAVE TO FILE FIRST AMENDED COMPLAINT
Case No. SACV13-01587 AG (DFMx)

implied misrepresentations about Quest's BRCA Assay, (2) identify and produce all similar communications, (3) confirm that it has stopped making any such representations, (4) provide Quest with the data referred to in the email, and (5) provide any data showing that Quest's BRCA assay is causing inaccurate results. (*Id.*)

On December 11, 2013, Myriad informed Quest that it strongly disagreed with the allegations in Quest's letter because all of the statements made in the Morrissey email are factually accurate.  (Docket No. 32-2 at Ex. 4, page 79.)  Nonetheless, to ensure there was no misunderstanding, Myriad agreed to "instruct its sales force to revise the language used when discussing the inaccurate results that have resulted from BRCA tests offered by some labs in a way that should fully address Quest's concerns."  (*Id.*)

The very same day, despite Myriad's voluntary concession, Quest sent Myriad another letter, repeating Quest's request for "all of the information requested in [Quest's] December 4 letter."  (Docket No. 32-2, Ex. 5, page 77.)  The next day, on December 12, 2013, Quest informed Myriad that Quest planned to file causes of action against Myriad based on the single Morrissey email.  (Biegler Decl. at ¶¶ 2-3; Docket No. 32-2, Ex. 6, page 79.)  Quest further told Myriad that Quest wanted to get the issue before the Court at the same time the Court was scheduled to hear Myriad's motion to dismiss for lack of jurisdiction.  (Docket No. 32-2, Ex. 6, page 79; Biegler Decl. at ¶ 3.)  Quest did not explain how the Morrissey email related to the patent claims at issue in its declaratory judgment

1  complaint or why a California federal court should hear state law claims based on

2  activity that occurred entirely outside the state.

3       Myriad sought to dissuade Quest from starting litigation over a single email

4  that was entirely truthful and resulted in no damage to Quest in any event.  (Biegler

5  Decl. at ¶ 4.)   Myriad told Quest that the Morrissey email was the only incident

6  Myriad was aware of where a Myriad employee had identified Quest by name in

7  an a communication that also discussed inaccurate BRCA test results (albeit not

8  referring to Quest's tests in any way).  (Biegler Decl. at ¶ 4.)

9

10      On December 13, Myriad again wrote Quest in an attempt to avoid litigation

11  over the single Morrissey email.  (Docket No. 32-2, Ex. 6, pages 79-80.)   Myriad

12  confirmed in writing that, after an investigation, Myriad had "identified only this

13  single, isolated incident where any Myriad employee mentioned Quest in a

14  communication that also discussed the inaccurate BRCA test results that have been

15  seen from some providers in the industry."  (*Id.*)   Myriad further explained that

16  "[t]his isolated communication was not authorized by Myriad, and no other related

17  emails or conduct has occurred" and reiterated Myriad had "voluntary ceased the

18  activity at issue" by "instruct[ing] its sales force to revise the language used when

19  discussing the inaccurate results provided by certain BRCA tests."  (*Id.*)

20

21      Myriad also attached a follow-up email sent by Mr. Morrissey on December

22  4, 2013, the day after the initial Morrissey email, which eliminated any possible

23  confusion about whether Mr. Morrissey's December 3 email referred to Quest's

24  BRCA assays.  (Ex. 2.)  In the December 4 email, Mr. Morrissey explained to Ms.

25  ███████ that his email referred to "other labs'" test results, not Quest's:

26

27

28

***My apologies if my email suggested that we are aware of this happening to one of your patients***.  While we know there have already been patients that have been given incorrect hereditary test results ***by other labs***, for patient privacy reasons, the specific patient information is not shared.

The purpose of my communication is to schedule a meeting so we may present the clinical differences in BRCA tests now available, especially concerning test quality and sensitivity.  My goal is to present this information so ███████████ can make a fully informed contract decision and potentially avoid a situation where a patient is managed sub-optimally based on incorrect genetic test results.

(Ex. 2 (emphasis added).)  Based on Mr. Morrissey's clarification (to the extent there was any misunderstanding), Myriad's confirmation that Mr. Morrissey's email was isolated, and Myriad's assurance that it has voluntarily ceased the activity in question, Myriad told Quest that Myriad believed it had addressed all of the concerns raised in Quest's letters.  (*Id*.)  Quest never responded to Myriad's December 13 letter, addressed the clarification made by Mr. Morrissey, or in any way conveyed that Myriad had not addressed Quest's concerns. Instead, Quest proceeded to file its motion to amend and to posture that motion for hearing at the same time as Myriad's previously-filed motion to dismiss or transfer.

### E.    Quest's Proposed Amended Complaint

On December 18, 2013, Quest filed its motion to amend the complaint.  In the amended complaint submitted with the motion, Quest proposes adding two state law causes of action to its declaratory judgment patent litigation:    (1) defamation under California common law and (2) unfair competition under California Business & Professions Code, Section 17200.  (Docket No. 32-2, Ex. 1, page 66.)  Quest alleges that this Court has supplemental jurisdiction over the two state law claims pursuant to 28 U.S.C. § 1367 but does not explain how they arise

from a common nucleus of operative facts or identify any "common and overlapping facts" with the federal patent suit. (*Id.* at ¶ 5.)

In the amended complaint, Quest identifies only the single Morrissey email, which does not mention Myriad's patents, as the basis for its proposed new causes of action.  Quest's complaint also encompasses "any similar statements to other Quest customers or third persons" but fails to acknowledge that Myriad confirmed in writing that the email was an isolated incident.  (Docket No. 32-2, Ex. 1 at ¶ 166, 169; Ex. 2.)  For relief, Quest asks for damages and an injunction enjoining Myriad from making false and misleading statements about Quest's BRCA tests, even though Myriad already agreed to voluntarily revise the language used when discussing BRCA test results.   (Docket No. 32-2, Ex. 1, page 67.)   Quest's complaint does not identify any actual pecuniary damage suffered as a result of the Morrissey email.

Strikingly, Quest's proposed amended complaint falsely asserts that "Myriad was presented with an opportunity to retract its false and defamatory statements, but it refused to do so." (Docket No. 32-2, Ex. 1, page 19.)  Quest makes this statement despite Mr. Morrissey's December 4 follow-up email, of which Quest was well aware.

## III.   ARGUMENT

In determining whether to allow leave to amend under Rules 15(a)(2), courts in this district consider:  (1) any bad faith or dilatory motive of the moving party; (2) potential prejudice to the opposing party; (3) whether the amendment would cause undue delay; and (4) the futility of the proposed amendment.  *Leadsinger,*

*Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227 (1962)).  Courts analyze motions to amend under Rule 15(d) under the traditional Rule 15(a) analysis, keeping in mind the additional factor of judicial economy.  *See Glatt v. Chicago Park Dist.*, 87 F.3d 190, 194 (7th Cir. 1996) (the standards under 15(a) and 15(d) are the same); *see also* Fed. R. Civ. Pro. 15.  Quest cannot amend under either Rules 15(a)(2) or 15(d) because its proposed amendments are futile, evince bad faith, and do not promote judicial economy.

### A.   Quest's Motion for Leave to Amend Should Be Denied Because Its New Causes of Action Are Futile.

It is well-established that courts may deny leave to amend if the amendment would be futile.  *Leadsinger*, 512 F.3d at 532; *see also Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995) ("Futility of amendment can, by itself, justify the denial of a motion for leave to amend.").  An amendment is futile if the plaintiff would be unable to prove facts under the amended complaint that would entitle the plaintiff to relief.  *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988).  Courts have found this standard met both where a claim fails for lack of jurisdiction and where a claim fails to state a claim upon which relief can be granted.  *See The Regents of the Univ. of Cal. v. Micro Therapeutics Inc.*, No. C 03-05669 JW, 2006 WL 449134, at *3 (N.D. Cal. Feb. 22, 2006) (denying leave to add trade secret misappropriation and unfair trade practices counterclaims to federal antitrust litigation as futile for lack of subject matter jurisdiction); *see also Towns v. Kernan*, No. CV 06/928 AG (FFM), 2010 WL 582056 (C.D. Cal. Feb. 11, 2010)

(denying motion for leave to add new claims that would not survive a motion to dismiss because they were untimely).  Quest's proposed new claims here are futile for both reasons.

### 1. Quest's Amendments Are Futile Because This Court Lacks Subject Matter Jurisdiction Over Quest's New State Law Claims.

This Court does not have supplemental jurisdiction over Quest's proposed state law claims.  Under 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form the same controversy under Article III of the United States Constitution."[6]  28 U.S.C. § 1367(a).  State law claims do not form part of the same case or controversy unless they arise from "a common nucleus of operative facts" such that a plaintiff "would ordinarily be expected to try them all in a single judicial proceeding."  *See United Mine Workers of Amer. v. Gibbs*, 383 U.S. 715, 725, 86 S. Ct. 1130 (1966).

Courts have consistently dismissed state law tort claims where jurisdiction is premised on federal intellectual property infringement claims because the claims arise under different operative facts.  *See In re Volkswagen of Amer., Inc.*, 296 Fed. Appx. 11, 13-14 (Fed. Cir. 2008) (denying writ of mandamus over district court's decision to decline to exercise supplemental jurisdiction over state law claims in

---

[6] Quest does not allege facts to support that its new state law claims are within the original jurisdiction of the federal courts.  Also, Myriad has separately moved the Court to decline jurisdiction over and dismiss Quest's declaratory action regarding Myriad's patent rights because that action was an anticipatory and preemptive act of forum shopping.  (Docket No. 20.)

patent case for declaratory judgment); *Edco Plastics v. Allynce, Inc.*, No. SACV 12-01168 JVS (JPRx), 2013 WL 1655916, at *3 (C.D. Cal. Mar. 18, 2013) (dismissing state law fraud claim based on lack of supplemental jurisdiction in federal patent case where fraud and patent claims were brought against different defendants); *Regents of the Univ. of Cal.*, 2006 WL 449134, at *3 (denying leave to add trade secret misappropriation and unfair trade practices counterclaims to federal antitrust litigation because the proposed counterclaims did not arise from the same transactions that gave rise to the alleged antitrust violations); *Trilithic, Inc. v. Wavetek U.S. Inc.*, 6 F. Supp. 2d 803, 806-07 (S.D. Ind. 1998) (finding no supplemental jurisdiction over a breach of contract claim even though the parties entered into the Non-Disclosure Agreement at issue in the contract claim to potentially settle patent case).

In one particularly relevant case, *Coehlo*, a court in this district dismissed a breach of contract claim for lack of subject matter jurisdiction where the court had original jurisdiction over a copyright validity declaratory cause of action about a movie, The Adjustment Bureau.  *See, e.g.*, *Coelho v. MRC II Distrib. Co., L.P.*, No. CV 11-8913-ODW (JCGx), 2012 WL 424387, at *2 (C.D. Cal. Feb. 8, 2012). In that case, the court dismissed six state law claims regarding contract rights to the movie for lack of jurisdiction because there was "no common nucleus of operative fact between the copyright validity determination and the six contract claims" even though there were some common "background" facts in that both the copyright and contract arose from the same work.  *Id.*

Like the cases cited above, Quest's state law tort claims do not arise from the same operative facts as Quest's patent declaratory judgment claims. The operative facts in the patent case include the identity, development and function of Quest's assays; Quest's sale or use of those assays; the conception and reduction to practice of Myriad's patent claims; and the prior art to Myriad's patents. On the other hand, the operative facts for Quest's state law claims include the content of the Morrissey email, how a reasonable person would understand that email, and whether the email caused any injury to Quest. Further, the email that Quest's new claims are based on says nothing about Myriad's patents or this lawsuit. As in *Coehlo*, Quest's federal and proposed state law claims may share some common background facts but they do not have any overlap in ***operative*** facts, and supplemental jurisdiction thus does not exist. *See Coelho*, 2012 WL 424387, at *2*; see also Trilithic*, 6 F. Supp. 2d at 806-07 ("The difference [between loose factual connection and background facts] is crucial to whether the Court has supplemental jurisdiction.").

Because the operative set of facts for the new state law claims is completely separate and independent from the patent claims, the Court does not have supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a), and Quest's new claims are therefore futile.

### 2.   Quest's Proposed  Section 17200 Claim Is Also Futile Because It Fails to State a Claim Upon Which Relief Can Be Granted.

Quest further cannot state a claim upon which relief can be granted for unfair competition under Section 17200 because (1) Quest has suffered no

economic injury and (2) Quest's claim has no ties to California.  Quest's motion to amend its complaint to add the Section 17200 claim should be denied for both of these reasons.

### i.      Quest Cannot Assert a Claim under Section 17200 Because It Has Suffered No Economic Injury.

Quest cannot state a claim for unfair competition under Section 17200 because it has not alleged *any* economic injury.  California Business & Profession Code Section 17204 provides the elements for standing to sue for a violation of section 17200 include the loss of money or property:

Actions for relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction by . . . a person who has suffered injury in fact and has lost money or property as a result of the unfair competition.

To satisfy Section 17204's standing requirement, Quest must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice . . . that is the gravamen of the claim." *Kwikset Corp. v. Sup. Ct.*, 51 Cal. 4th 310, 322-23, 246 P.3d 877, 120 Cal. Rptr. 3d 741 (Cal. 2011) (emphasis in original).

Quest's amended complaint does not allege any loss or deprivation of money or property whatsoever, and Quest thus cannot possibly meet the Section 17204 standing requirements.  (*See* Docket No. 32-2, Ex. 1 at page 52.)  Indeed, Quest failed to allege that it suffered any loss as a result of the Morrissey email, such as ▮▮▮▮▮▮▮▮▮▮▮▮▮ business, and there is no evidence that it did.  Therefore, Quest's proposed unfair competition allegations do not meet Section 17204's standing requirement

17

ii.     **Quest Cannot State a Claim Under Section 17200 Because Quest's Claim Has No Ties to California.**

Quest has also failed to state a cause of action for unfair competition because Section 17200 does not apply to allegedly unlawful behavior occurring outside California causing injury to nonresidents of California.  *See Sullivan v Oracle Corp.*, 51 Cal. 4th 1191, 1207-09, 254 P.3d 237, 127 Cal. Rptr. 3d 185 (Cal. 2011); see *also Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222-27, 85 Cal. Rptr. 18 (Cal. Ct. App. 1999).   Quest has not alleged any unlawful behavior in this state, and Quest cannot because the allegedly unlawful behavior occurred outside of California.   That behavior consists of the single email sent from Mr. Morrissey, who is located in Arizona, to Ms. ▮▮▮▮ who is located in ▮▮▮▮ and whose clientele are located entirely within ▮▮▮▮ (Exs. 2, 4.)  Ms. ▮▮▮ subsequently contacted Sandra St. Pierre, who works for Quest Diagnostics in Oregon.  (Exs. 2-3.)

Quest has also failed to allege that a California resident suffered any injury as a result of the email.  Quest Diagnostics is not a California resident.  (Docket No. 1 at ¶ 2 ("Quest Diagnostics is a corporation organized and existing under the laws of the State of Delaware" with its principal place of business in New Jersey).)  Quest Nichols is a California resident, but Quest fails to allege that Quest Nichols suffered any injury from the email.  Indeed, Quest Nichols is merely the testing laboratory where Quest's BRCA test was developed and where "Quest intends that information obtained from those tests will be analyzed."  (*Id.* at ¶¶ 3, 7; *see also* Ex. 5 (describing Quest Nichols as playing a "key role in Quest Diagnostics research and development efforts").)  Because it is the corporation that actually

sells, markets, and provides the BRCA tests, Quest Diagnostics in New Jersey—not Quest Nichols—is the entity that would suffer any damage from a defamatory publication.  (Docket No. 1 at ¶¶ 2, 54; *see also* Ex. 6.)

### 3.    Quest's Proposed Defamation Claim is Futile Because It Fails to State a Claim Upon Which Relief Can Be Granted.

Quest cannot state a claim for defamation (or trade libel) for multiple reasons.  First, Quest's complaint sounds more in trade libel than defamation, but Quest has failed to specifically plead trade libel and has not pled pecuniary damages, as is required to support a trade libel claim.  Second, even if Quest could proceed on defamation, all of the statements in the Morrissey e-mail are true and Mr. Morrissey corrected any misunderstanding the very next day.

### i.    Quest Cannot State a Claim for Defamation Because the Morrissey E-mail Did Not Concern Quest's Reputation.

Quest cannot state a claim for common law defamation based on the Morrissey email because Quest's allegations, even taken on their face, do not call into question Quest's reputation but instead (in Quest's incorrect view) relate to the quality of Quest's BRCA assays.

Unlike an action for *trade libel*, an action for defamation is to protect the personal reputation of the injured party.  *Aetna Cas. & Sur. Co., Inc. v. Centennial Ins. Co.*, 838 F.2d 346, 351 (9th Cir. 1988); *Polygram Records, Inc. v. Superior Court*, 170 Cal. App. 3d 543, 549, 216 Cal. Rptr. 252 (Cal. Ct. App. 1985).  A plaintiff may support a claim for defamation in the context of product disparagement by showing that the publication at issue accuses the plaintiff of "dishonesty, lack of integrity or incompetence or impl[ies] a reprehensible personal

19

characteristic." *Polygram*, 170 Cal. App. 3d at 549; *see also Barnes-Hind, Inc. v. Superior Court*, 181 Cal. App. 3d 377, 385, 226 Cal. Rptr. 354 (Cal. Ct. App. 1986) (explaining the difference between defamation and trade libel).  On the other hand, plaintiffs cannot support a claim for defamation based on statements about the characteristics of the plaintiff's products, without more to assault the plaintiff's personal reputation.  *Polygram*, 170 Cal. App. 3d at 549; *Allen v. Ghoulish Gallery*, Civil No. 06cv371 NLS, 2007 WL 4207923, at *15 (S.D. Cal. Nov. 20, 2007) (finding claim about statements regarding product quality "more akin" to trade libel than defamation).

Quest's defamation claim relates to supposed statements that Mr. Morrissey made about the accuracy of Quest's BRCA assays, not about Quest's character, and thus cannot support a classic defamation claim.  Indeed, the gist of Quest's complaint is that Myriad disparaged Quest's BRCA tests.  (*See, e.g.,* Docket No. 32-2, Ex. 1 at ¶¶ 75-79.)  Quest does not allege and cannot allege that Mr. Morrissey's statements accused Quest of dishonesty, lack of integrity, or implied a reprehensible characteristic.  To the extent Quest alleges that Mr. Morrissey's statements could somehow be read to accuse Quest of incompetence, California courts have held that statements relating solely to product quality are insufficient to support a defamation claim on that basis.  *See Polygram Records*, 170 Cal. App. 3d at 549 ("It might be possible to imply some accusation of personal inefficiency or incompetence, at least, in nearly every imputation directed against a business or its product," courts "have gone to some lengths, however, in refusing to do so,

particularly where the most that can be made out of the words is a charge of ignorance or negligence.")

Quest likely plead common law defamation instead of trade libel for a good reason.  In order to state a claim for trade libel, Quest would have to show that the Morrissey e-mail (1) induced others not to do business with it and (2) caused special damages in the form of pecuniary loss.  *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1113 (C.D. Cal. 2004).  Quest does neither in its complaint.  Thus, even if read as a claim for trade libel, Quest's claim for defamation is futile.

ii.     **Quest Cannot State a Claim for Defamation Because the Statements in the Morrissey Email Are True.**

Quest's claim for defamation also fails because each statement in the email is true, and the email thus cannot be defamatory.  *See Smith*, 72 Cal. App. 4th at 646 ("In all cases of alleged defamation, whether libel or slander, the truth of the offensive statements or communication is a complete defense against civil liability, regardless of bad faith or malicious purpose.").  Indeed, Quest has failed to allege that any particular statement in the email is factually false.  Rather, Quest cuts and pastes phrases from the email together to manufacture a false statement that was never made.  (*See* Ex. 2.)  In reality, the email does nothing more than state that (1) there are new labs offering BRCA testing, (2) tests may be ordered from one lab even though another is specified as the test of choice, (3) some patients have received inaccurate results, and (4) there is no guarantee of equivalence for new tests in the way that there is for approved drugs.  (Ex. 2.)  Quest has not alleged that any of these statements are false.

The statements also cannot be defamatory because they are not directed at Quest.  The Morrissey email explicitly refers to "new labs," not Quest, in the sentence that mentions inaccurate test results:

> At the moment, **there are new labs** offering this testing and unfortunately there are patients that have already received inaccurate results that have resulted in the wrong care.

(Ex. 2.)  Even if this single communication could reasonably be understood to refer to Quest's assays (which it cannot), Mr. Morrissey himself erased any doubt less than 24 hours later when he told Ms. ▮▮▮▮ that he was not referring to Quest:

> ***My apologies if my email suggested that we are aware of this happening to one of your patients***.  While we know there have already been patients that have been given incorrect hereditary test results ***by other labs***, for patient privacy reasons, the specific patient information is not shared.

(Ex. 2.)

Quest's attempt to analogize the Morrissey email to the letter sent in *Oliver* is misplaced.  *Oliver & Tate Enters. v. Founds. Worldwide, Inc.*, No. 13-cg-1683, 2013 U.S. Dist. LEXIS 114527, at *24 (C.D. Cal. Jun. 18, 2013).  First, in *Oliver*, the plaintiff alleged trade libel—not defamation—and thus the case does not apply to Quest's claim.  *Id.* at *20.  And, even if Quest's complaint could be read to plead trade libel, the plaintiff in *Oliver* pled pecuniary damages in the form of lost profits, something Quest failed to do here.  Second, even if *Oliver* applied, the defendant in that case "continue[d] to make false statements regarding safety concerns with plaintiff's products," unlike Myriad who voluntarily agreed to instruct its sales force to revise the language used when discussing the inaccurate results generated by other labs' BRCA tests in a way that should fully address

Quest's concerns.  *Id.* at *25.  Finally, unlike the *Oliver* case, here Mr. Morrissey sent a follow-up email the very next day confirming that the inaccurate test results were not from Quest.  (Ex. 2.)

**B.    Quest's Proposed Amended Complaint Is a Litigation Tactic, Brought In Bad Faith.**

Quest's motion for leave to amend should also be denied because its new claims are no more than a litigation tactic to try to gain an advantage in the parties' ongoing dispute about venue.

Quest's motive is evident from the interactions between the parties preceding Quest's motion to amend.  After Quest initially contacted Myriad about the Morrissey email, Myriad quickly responded and, while strongly disagreeing with Quest's accusations, voluntarily agreed to instruct its sales force to use different language when referring to the incorrect BRCA test results generated by some labs.   Myriad also investigated, did not find any other customer communications referring to Quest while also discussing the incorrect test results, and confirmed this for Quest in writing.   Finally, Myriad sent Quest Mr. Morrissey's December 4 follow-up email confirming that he was not referring to Quest's BRCA assays.  Myriad reasonably addressed all of Quest's concerns. However, instead of working further with Myriad to resolve the dispute without litigation, or identifying additional concerns, Quest rushed to file its motion to amend so that it could be heard, not coincidentally, on the same day as Myriad's motion to dismiss for lack of jurisdiction or to transfer.

Quest's bad faith can also be inferred from the weakness of the proposed new claims and the lack of any identifiable harm to Quest. As explained above, Quest's new claims are based on a single email, which did not contain any false statements. But, even more importantly, there is no need for an injunction and no injury or potential damages to recover. With respect to the single Morrissey email, Quest has not alleged that it suffered any injury, no less one for which it could recover actual damages. For instance, Quest does not allege that it lost any business as a result of the Morrissey email. Moreover, to the extent Ms. ███ misunderstood the Morrissey email, Mr. Morrissey corrected any misunderstanding in his email of the very next day. As for "any similar statements," Myriad has also confirmed, in writing, that the email from Mr. Morrissey was an isolated incident, not authorized by Myriad, and has agreed to cease the activity in question. Given the lack of relief available for Quest's new claims, one does not to have to dig deep to uncover the true motivation for Quest's new claims.

Finally, Quest's bad faith is evidenced by its misrepresentations to this Court in its opening brief and proposed amended complaint. Nowhere in Quest's proposed amended complaint or opening brief is any mention of Myriad's voluntary action to instruct its sales force to change communications regarding inaccurate test results. Even more remarkably, while barely acknowledging Mr. Morrissey's follow-up email, which Myriad sent to Quest days before Quest filed its motion, Quest alleges that "Myriad was presented with an opportunity to retract its false and defamatory statements, but it refused to do so." (Docket No. 32-2, Ex.

1 at ¶ 77.)  Not so.  Mr. Morrissey told the potential customer:  "My apologies if my email suggested that we are aware of this happening to one of your patients. While we know there have already been patients that have been given incorrect hereditary test results by other labs, for patient privacy reasons, the specific patient information is not shared."  (Ex. 2.)

Given the futility of Quest's new causes of action and the fact that they have nothing to do with the patent case, Quest's motion to amend should be seen for what it is: an attempt to gain an advantage in the parties' ongoing venue dispute.

### C.   Judicial Economy Would Not Be Served by Quest's Proposed Amendments

Especially given the futility of Quest's claims and its bad faith in bringing its motion, judicial economy would not be served by allowing Quest to inject its weak state law claims into this federal patent case.  Although Quest's new state law claims are futile, if it so chose, Quest could try to bring those claims in another forum.  As described above, Quest's new state law causes of action are not based on the same operative facts as, and raise entirely different legal and factual issues, than the declaratory judgment patent case.  Thus, the new state law claims would require additional discovery, including depositions of witnesses such as Mr. Morrissey and Ms. ███, who otherwise would likely not be involved in the patent case.  Therefore, this additional factor considered under Rule 15(d) weighs against granting Quest's motion for leave to add its new state law claims to this case.

## IV.   CONCLUSION

For the foregoing reasons, Myriad respectfully requests that the Court deny Quest's Motion for Leave to File First Amended Complaint.

Dated:  January 13, 2014                         FISH & RICHARDSON P.C.

By:   */s/ Geoff D. Biegler*
Jonathan E. Singer (Bar No. 187908)
singer@fr.com
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099

Geoff D. Biegler (Bar No. 290040)
biegler@fr.com
FISH & RICHARDSON P.C.
555 West Fifth Street, 31st Floor
Los Angeles, CA 90013
Telephone: (858) 678-5070
Facsimile: (877) 417-2378

John M. Farrell (Bar No. 99649)
farrell@fr.com
Limin Zheng (Bar No. 226875)
zheng@fr.com
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063-1566
Telephone: (650) 839-5070
Facsimile: (650) 839-5071

Benjamin G. Jackson (Bar No. 255358)
bjackson@myriad.com
MYRIAD GENETICS, INC.
320 Wakara Way
Salt Lake City, UT 84108

Attorney for Defendant
MYRIAD GENETICS, INC.

1

**CERTIFICATE OF SERVICE**

2          The undersigned hereby certifies that a true and correct copy of the above and

3 foregoing document has been served on January 21, 2014 to all counsel of record

4 who are deemed to have consented to electronic service via the Court's CM/ECF

5 system per Civ. L.R. 5-3.3.  Any other counsel of record will be served by U.S. mail

6 or hand delivery.

7                              By: */s/ Geoff D. Biegler*
                                    Geoff D. Biegler

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

27
MYRIAD'S MEMO IN OPPOS TO QUEST'S MOTION
FOR LEAVE TO FILE FIRST AMENDED COMPLAINT
Case No. SACV13-01587 AG (DFMx)